...that you should place, including this one, is a similarity to Mark's in the fact that the party's goods and services are closer to the label. In this case, NRECA has appealed the decision to the board because the factual findings of the board do not, uh, are not based on substantial evidence. I'm going to explain the background. You can go directly to Mark. Aren't there a lot of differences? I mean, you've got five lines versus three lines. There's wavy hills as opposed to straight, uh, uh, presentations. You've got one circle versus two circles. You've got the Suzlon, uh, word below the circle. Uh, there's a lot of differences here. There are certainly differences between Mark's and Mark's. They're not identical. However, this is not a side-by-side comparison, nor do consumers retain any specific... We've also got a difference, kind of, we've got a difference in the services that are being rendered here, too, right? We do. In, uh, wind turbines versus rural electrification? It's certainly the, the, the parties, and the main argument, uh, by Suzlon is that the party's goods and services are different in kind. That's not the test. The test is whether it's not confusion as to the goods, but as to the source of those goods. Well, and the consumers are pretty sophisticated. Uh, things are starting to mount against you here. I think if you look at the facts on the, that are in record, that, uh, it actually... There is a preponderance of evidence that, that there is an overlap in the marketing of the party's services and goods, and that these Mark's are strikingly similar, and there's no evidence or record that these parties are immune from source confusion, despite the, the cost of these goods. The only record, the only evidence or record that the purchasers are sophisticated is, in fact, because of the cost of the goods. Now, with respect to the relatedness of the party's goods and services, the, the case cited by the board in Melville sets out the standard for, for confusion. That is, if the party's services and goods are marketed in such a way that consumers are likely to encounter them, the Mark's under certain circumstances are likely to lead to, uh, confusion as to an association or a mistake as to an association between the parties. Here, the board simply relies on the fact that the parties operate in the same general field of electrification, but that's not supported by the evidence or record. The evidence or record shows that NRECA is heavily involved in the promotion, promoting... It's promoting wind energy as a means of marketing its association services. If you look at the record, um, NRECA has seminars in the field of wind energy. They publish a white paper in the field of wind energy. They have, also have, uh, legislative initiatives in the field of wind energy. They attend, uh, Department of Energy conferences on wind energy to promote wind energy. And this is identical to SUSLON. If you look at their specimen, you submitted with their registration. They also are, are promoting wind energy. So, while there is a difference of purpose for the promotion of wind energy, you have the, the overlapping of the manner in which the parties promote, market their, their services. What's, what's the harm, as you would imagine? Well, the harm is to the NRECA association by having members free-riding, or having non-members free-riding up the, the, uh, the value of the association in its mark by having an endorsement, uh, an unofficial, a, an appearance of an endorsement where there, in fact, is an endorsement, uh, by the, by, of NRECA, of SUSLON. SUSLON could, the record shows that SUSLON could be an NRECA member. They could be using their mark, SUSLON, as a house mark. The record shows that over 600 different entities use their house marks in connection with the Green Ball logo. And so, I think that the, the, the issue raised by the board, that the addition of the term SUSLON is somehow distinguishing the party mark, I, I think is, is inaccurate in, in two regards. First, the addition of a house mark to an inherently distinctive mark, I don't think, in, there's no case all decided by the board or by SUSLON that that somehow distinguishes, uh, the party's marks. If, if anything, if you go back to a long line of precedence, that would, it, it tend to be an aggravation. And even if this board were to find that that were the general rule, this clearly is a case where there would be an exception to that rule because you have a, a simple design, inherently distinctive design mark, which, by its very use, is used in addition to house marks in the same exact same manner that SUSLON adds its house mark to a confusingly similar design. If you look at the designs, both parties use their marks in the color green. In addition, while the board pays a lot of, uh, adherence to the fact that the NRECA Green Ball logo has the occurrence of a rolling countryside, there's no evidence of record to suggest that consumers would view it that way. That comes from the NRECA, uh, Green Ball logo, um, guidebook on the use. Now, it's similar to a car manual. I'm sure NRECA would love for all of its members to read every page of its style manual, but it simply does not always occur in that manner. So, in sum, the, the fact that it, it, um, that there, it, the board attributes this meaning to NRECA's Green Ball logo, it does, it, it is not supported by the, by the record. In addition... When did your client start to use the mark that it's... It started to use the mark, uh, around 1987 or 1988. It started developing the Green Ball logo. It's, uh, been used in, um, throughout their, their marketing efforts. It's, it's a, uh, industry standard. And millions of dollars are spent each year, record shows the millions of dollars spent each year publishing materials, including, uh, lots of information promoting wind power using the Green Ball logo. Okay. Uh, another... Thank you. I'm sorry. What would you like to say for the rest of your time? Is there anything else? No, I do have a whole point to raise, and that is that the board gives short shrift to the fact that the party's marks both have circular designs, and that somehow is diminished by the fact that circular designs are common geometric shapes. Now, there's no evidence of record to suggest that other parties use a circular logo, and there's no reason to denigrate the Green Ball logo on account of it having a common geometric shape. It would be similar to a wordmark that you denigrate by saying that it has the letters S, T, and E. To the contrary. It's a pretty established point in, in trademark law that circles can't be a distinctive feature. It has to be something available to common use by all. Well, I, I think in Anton Bauer, the case cited by the board, it deals more with carrier's marks. You're throwing it upstream on this, is what I'm telling you. There's just an awful lot of law that circles are not going to provide you with distinctiveness. Circles, certainly not by itself is going to provide us with distinctiveness. It's the entirety of the mark, which... It's the entirety of the mark. But I don't think there's any reason to suggest that simply because it has a circular feature to begin with that it's somehow less of an important distinction if in an industry nobody else uses a circle logo than if you have one entity that is using it and another comes along. I think that's going to increase the likelihood of confusion despite the fact that circles are common geometric shapes to begin with. And how do we know that in the industry nobody else uses circles? Well, that's... There's no evidence or record to suggest that anybody does, so I don't think it's... But everybody would be entitled to, wouldn't they? Because that is a principle of trademark law that circles, by their nature, are not monopolizable. I'm not aware of any precedent that circles are... We're not going to give anybody a mark solely on the basis of the fact that it's a geometrical circle artwork. I think that... That's got to be available to everyone for free competition. Well, I don't think that's necessarily true because, as you know, trademarks are defined by... Everybody has lapeltins. They're almost universally circles. True. And if you have common usage in the industry of circle lapeltins, that's absolutely true. Everybody should be able to use circle lapeltins. But if you're talking about in connection with a specific good or service, certainly a plain circle mark could clearly be a trademark and could be a very strong trademark. I don't think there's any reason to naturally denigrate it. Let's put it this way. If Coca-Cola can't sell itself as having a circle, I don't think you're going to either. They're going to have to do it on the basis of something other than circularity. You probably do, too. True. And there is more to... I think we've all learned that it's a whole circle design. I think I'm going to reserve my time for if anyone has any further questions. We'll save your vital time and we'll go from the other side. Thank you, Mr. Newgate. Mr. Horowitz. May I please report? Jay Horowitz on behalf of Suzlon Wind Energy Corporation. Trademark trial appeal work correctly concluded, based on substantial evidence, that no likelihood of confusion would result from the continued registration of Suzlon's trademark. Because of the different designs, as well as the presence of the unique wording Suzlon in my client's mark, the two marks are very different in their appearance, sound, and connotation. Well, I don't know if very different is in fact... The real question is, is there likelihood of confusion? That's correct. But I would think it would be at least as much in Suzlon's interest in avoiding confusion among at least overlapping customers and observers. That's correct. And so one looks at the similarities as well as the differences. It would certainly be in both parties' best interest for the marks not to be confused. Did you do a search before you got this mark? Yes, a search was conducted. Did you find the NRECA mark? This search, I believe, was... No recall of seeing the NRECA mark, and the examining attorney that signed the application also conducted a search and did not cite any marks as confusingly similar. And the mark was published for opposition. No parties came forward to object, and the mark was registered in due course. And four months later, NRECA petitioned for cancellation of the mark. There was some... Judge Rader pointed out some of the differences between the marks. There are a couple more I wanted to point out or emphasize. The fact that both marks have lines inside of the circles, but the lines are very different. In the five lines in the NRECA mark, they're wavy and curvy lines, and they're different, three are different. When you look at them side by side, but when you don't look at them side by side, one does get an overall effect that might give one pause who isn't closely familiar with the marks, don't you think? I would disagree. When I look at the marks side by side, I see one with the curves. It looks like a countryside scene. When you look at them side by side, it's easier to point out the differences. When you don't look at them side by side, and you don't know the marks very well, it does make you stop and think, doesn't it? Your Honor, I would disagree. My client's mark, Suzanne's mark, seems to indicate the letter S. The lines, they're straight lines and they have a bend, and to me it looks like the letter S. Do you ever use this mark without the word Suzanne underneath it on a pen, say just as the lines on the circle? To my knowledge, I haven't seen any use, I haven't heard of any use from my client without the Suzanne appearing underneath the circle design. And that's the specimens of record which were submitted, of course how to match the mark, and the other materials I've seen all have Suzanne underneath the design. So you think the mark was designed without knowledge of this other potential confusion? Yes, I do, Your Honor. My client was not aware of the existence of this energy cooperative. I don't believe it's that well known. My client's circles, they sell to very large companies. Small, rural cooperatives don't typically purchase wind turbines. There's an example in the record of one cooperative, one member of that has bought a few smaller wind turbines, but my client sells very large industrial sized turbines. Companies the size of John Deere, very big companies that buy these very large utilities. And they weren't even aware of the existence of this entity. One item I want to point out, Mr. Medgar mentioned that there's evidence in the record that both parties used the green, that the marks are green balls, and there's evidence in the record that that's not the case. Suzanne has been known to use the mark with the color red. In fact, the specimens submitted with their application were red. In the joint appendix, I don't believe, they're photocopied in black and white, so it's not clear, but they're used with red, and the materials I've seen have them used in red. And the deposition testimony put forward by NRECA, Ms. Parks testified that she's seen the mark in both green and red. So there is evidence in the record that my client uses it with other colors as well. And neither party has the exclusive right to use the color green. My client's registration is not for any particular color, neither is NRECA's, and any party can choose to use the color as they see fit. Green is a common color used in the energy industry. Furthermore, there's one other item. I want to emphasize that the TTAB properly noted that my client's mark does feature prominently the mark Suzanne in the wording, and that should act to further differentiate the marks. As far as source confusion, the mark can be pronounced and used to describe the source of wind turbulence. Does the registration include the name? Yes, it does, Your Honor. The design and the name below it in block letters. So the registration is a word and design mark. Also, NRECA has indicated that both parties have appeared at some of the same trade shows, yet there's been no evidence of any confusion taking place at any of these trade shows. There's actually been no actual confusion. NRECA argues that there's this one email from one of their general counsels of a member of the cooperative, but he noticed it, Mr. Fugleson, he noticed it right away, that the marks are different, and this wasn't a case of actual confusion, but it's a counsel evaluating a potential legal action. The standard is likely not actual, right? That's correct, but I just wanted to point out that there hasn't been any actual confusion, nor a likelihood of confusion. The marks really themselves are very different, in my position. You can't say they're very different. You might say they're sufficiently different to co-exist, but I don't think you can say they're very different. Your Honor, I believe they're very different. They have some similarities in that there's a circle, a dark circle, and there's some lines, but really, one has an S symbol, and one has a scene of the countryside. You see the power lines, and in their style manual, NRECA indicates that it's designed to look like power lines going across the green rolling hills of America's countryside. There's nothing like that. We're reading a line or a couple of blue-green lines. It may be true, but I think... Your Honor, do you just take them as they are? Your Honor, I do see a difference, and I think consumers would as well. I think that TTAB, in a very reasoned opinion, evaluated the marks in their entireties and also evaluated the goods and services, and they're really not highly related. My client's goods are very specific. Wind turbines in Class VII, and NRECA's marks are registered for other classes, 14, 16, 41, and 42, but not Class VII. Because of that, there's potential for some overlap. NRECA has mentioned that they have some training with wind energy. Wind energy is just one type of energy, and there's a potential for some overlap, but really, my client's goods are quite specific, and they're marketed really towards customers that are sophisticated purchasers. To buy a large piece of equipment like a wind turbine requires a lot of thought and research. The same thing as joining a cooperative. The wind generates electricity, doesn't it? That's correct. You're not just running things directly on the wind. There's wind energy that's converted to rotational energy, and my client's device will... I'm not sure of the exact size of it, but it has a nacelle that's able to... Electrical energy. Right. That's correct. It's the same kind of energy that this association is concerned with, is it not? Yes, well, we can see that both marks are in the same broad energy field, the energy industry. But my client's marks are very specific to... They're in Class VII only, and it's one type of product which is really sold to sophisticated purchasers. Any more questions? Thank you, sir. Thank you, Your Honor. Your Honor. In the record, it shows there's a natural affinity between wind turbines and rural electric cooperatives. Wind parks, by definition, are in rural areas. Rural cooperatives are very big in rural areas, and it's natural for anybody who's considering a wind energy project, whether it be at a co-op or a traditional electric utility, to actually go and research the topic. They're going to go to seminars. They're going to be exposed to the NRECA logo. They're going to go to the Department of Energy seminars on wind energy. They're going to look at legislative initiatives. The NRECA publishes... ...on benefits of wind power, on developments in legislation encouraging wind power. So they're going to be exposed to the market, all these contexts, and then they're going to go back, and they're going to get bids, and they're going to go to trade shows, and they're going to be exposed to NRECA in some circumstances, and they're going to be exposed to Sumon in some circumstances. So you can have a clear, natural overlap between wind turbines. There's no restrictions in the registration that they only sell to large manufacturers of electricity. They presumably travel on all channels of trade. And the last thing is that the classification used by the federal government is administrative convenience. It has absolutely nothing to do with the likelihood of confusion. Again, the only arguments that they make are distinctions as to the kinds of goods and not to the confusion as to the source of those goods. Given the fact that the similarities of marks are more important than the differences, it's particularly in the design context. We believe the preponderance of the evidence in this case clearly supports cancellation of the registration. This Court has plenary review to reevaluate the likelihood of confusion decision, and given the absence of evidence supporting the Court's decision regarding the relatedness of the parties' goods and services in the similarity of the marks, we move that this Court should bring that petition.